# Exhibit 4

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| GIANNI VERSACE, S.p.A., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-07869 |
| | ) | |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| ZOU YULAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

On November 7, 2017, this Court granted an ex parte temporary restraining order sought by plaintiff Gianni Versace, S.p.A. ("Versace"). Now before the Court is Versace's Motion for Preliminary Injunction [31]. Seven of the defendant partnerships listed in Schedule 'A' filed responses objecting to the preliminary injunction (collectively "the objecting defendants") [38, 40]. For the reasons stated herein, this Court grants Versace's motion for preliminary injunction.

## Statement

Versace's amended complaint alleges trademark infringement and counterfeiting, false designation of origin, cybersquatting, and violation of the Illinois Uniform Deceptive Trade Practices Act. Versace contends that defendants are offering for sale unauthorized and unlicensed imitations of Versace luxury fashion products, including jewelry, handbags, home goods, and other products, using counterfeits of Versace's federally registered trademarks through online stores.

On November 7, 2017, this Court granted Versace's ex parte temporary restraining order, authorized electronic service, and froze PayPal accounts associated with the defendants' online stores. Versace's motion for preliminary injunction requests that the Court continue the injunction prohibiting defendants from further manufacture, importation, distribution, offering for sale and selling of counterfeit Versace products. Versace also seeks to continue the asset freeze on

1

defendants' accounts in U.S.-based financial institutions, including PayPal.

In order to obtain a preliminary injunction, Versace must show that it has a reasonable likelihood of success on the merits and that it will suffer irreparable injury if the order is not granted because there is no adequate remedy at law. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002), *as amended* (Oct. 18, 2002). If the Versace can satisfy these conditions, the Court must then consider whether defendants would incur any irreparable harm from an injunction. *Id.*

Versace gives fairly short shrift to the conditions for granting a preliminary injunction, largely relying on the Court having granted a temporary restraining order. Nevertheless, there is sufficient basis to continue the preliminary injunction prohibiting the defendants from manufacturing, importing, distributing, offering for sale, and selling counterfeit Versace products. However, defendants, Worthproduct, Expressings, and Dongguan Coolstyle Jewelry Co., Ltd., object to the entry of a preliminary injunction that includes freezing all of defendants' PayPal accounts. Likewise, defendants Chuangbang Store, Minjifen-0, Yitsing, and Uloveido Official Store, object to the freezing of all assets in their PayPal accounts.

A preliminary injunction should be tailored to the violation. *Commodity Fut. Trading Comm. v. Lake Shore Asset Mgmt. Ltd.*, 496 F.3d 769, 772 (7th Cir. 2007). To exempt assets from an asset freeze, "[t]he burden is on the party seeking relief to present documentary proof that particular assets [are] not the proceeds of counterfeiting activities." *Monster Energy Co. v. Wensheng*, 136 F. Supp. 3d 897, 910 (N.D. Ill. 2015) (Lefkow, J.) (citing *Luxottica USA LLC v. The Partnerships, et al.*, No. 1:14–cv–09061, 2015 WL 3818622 (N.D.Ill. June 18, 2015)). Here, the objecting defendants have submitted affidavits and PayPal account information purporting to show that the freezing of all their PayPal assets is overly broad. Versace persuasively argues that the objecting defendants' sales representations and documentation do not actually establish that particular assets are not the proceeds of counterfeiting activities. The PayPal account transaction logs highlight products that

2

Versace has already identified as allegedly counterfeit and those are the products that the objecting defendants claim should be frozen and the remainder released. However, the other transactions contained in the logs only list products by title and do not contain an image. Without a visual representation of the product sold, there is no way to determine from these logs if other transactions were for products carrying Versace's marks. The objecting defendants also do not provide any evidence that PayPal is the sole method of payment available to their customers, and thus, there may be other means for defendants to sell allegedly counterfeit wares.

Versace contends that the assets should all remain frozen because Versace is seeking the statutory maximum of $2 million for each violation. Defendants argue that none of the assets should be frozen because Versace is seeking statutory damages and such restraint on assets is only available where an equitable remedy is sought. *See Grupo Mexicano de Desarrolla v. Alliance Bond Fund,* 572 U.S. 308, 333 (1999) (holding that a court may restrain assets to preserve equitable remedies).

> Title 15, Section 1117 allows a plaintiff to elect, at any time before final judgment is rendered, one of two alternative recovery options for trademark infringement: (1) the actual damages caused by the infringement, 15 U.S.C. § 1117(a); or (2) statutory damages. 15 U.S.C. § 1117(c). Congress provided the statutory damages option of 15 U.S.C. § 1117(c) through the Anticounterfeiting Consumer Protection Act of 1996, Pub.L. No. 104–153, § 7, 110 Stat. 1368. This option was added due to the concern that a counterfeiter might hide, alter or destroy records, thus making it impossible for a plaintiff to determine the scope of, or be able to prove, actual damages. *Louis Vuitton v. Veit,* 211 F.Supp.2d 567, 583 (E.D.Pa.2002) (citing S.Rep. No. 177, 104 Cong. (1995)).

*Lorillard Tobacco Co. v. S & M Cent. Serv. Corp.,* No. 03 C 4986, 2004 WL 2534378, at *3 (N.D. Ill. Nov. 8, 2004). The Court may freeze assets to preserve the plaintiff's equitable remedy for an accounting. *Luxottica Grp. S.p.A. v. Zhiqiang Zhao,* No. 16 C 7988, 2017 WL 1036576, at *7 (N.D. Ill. Mar. 17, 2017) (Leinenweber, J.) (citing *Klipsch Group, Inc. v. Big Box Store Ltd.,* 2012 WL 5265727 at *3 (S.D. N. Y. Oct. 24, 2012)). Thus, once plaintiffs declare they are <u>only</u> seeking statutory damages there would be no reason to continue to restrain plaintiff's assets. *Id.* Versace has not yet stated that it will only seek statutory damages. Indeed, the relief sought in the complaint includes an accounting.

3

Accordingly, this Court will maintain the restraint on defendants' assets.

**Conclusion**

Based on the foregoing, Versace's Motion for Preliminary Injunction is granted.

IT IS SO ORDERED.

Date:  December 4, 2017

Entered: _____

SHARON JOHNSON COLEMAN
United States District Judge

4

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LUXOTTICA GROUP S.P.A AND OAKLEY, INC., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | No. 18-cv-6608 |
| | ) | |
| THE PARTNERSHIPS AND UNINCORPORATED | ) | |
| ASSOCIATIONS IDENTIFIED IN SCHEDULE "A", | ) | |
| | ) | Judge Thomas M. Durkin |
| *Defendants.* | ) | |

## ORDER

Defendants mogautt and abuyone's motion to unfreeze their assets (R. 52) is denied without prejudice in part and granted in part. Defendants' motion for an extension of time to file their reply (R. 71) is denied. If Defendants can offer competent evidence to support their motion, the Court will revisit the freeze order. Plaintiffs are ordered to post $50,000 as bond, representing $25,000 per Defendant in this order.

### STATEMENT

Plaintiffs brought suit against dozens of defendants alleged to have sold and offered for sale products bearing unauthorized or counterfeit versions of Plaintiffs' Oakley trademarks. As is common in these cases, Plaintiffs sought a preliminary injunction that included an asset freeze of the Defendants' PayPal accounts. The injunction was granted on November 20, 2018. R. 42. On January 4, 2019, the Defendants moved to unfreeze their assets, claiming the amount frozen ($48,660.80) was significantly more than the amount of the allegedly counterfeit products sold globally ($206.53). They ask the Court to modify the injunction to limit the seizure to $192.78 for mogautt and $13.75 for abuyone, reflecting the allegedly infringing products sold. In the alternative, Defendants seek a bond of at least $25,000 per defendant from Plaintiffs.

The basis for freezing Defendants' PayPal accounts was to preserve Plaintiffs' right to determine how many counterfeit products were sold.[1] Plaintiffs established a high likelihood that all the defendants, including the Defendants here, willfully infringed the Oakley trademarks and therefore an accounting of Defendants' profits from the sale of counterfeit merchandise would be an appropriate and available remedy. Plaintiffs also established that there was an appreciable risk that

---

[1] Plaintiffs also seek statutory damages of $2,000,000 per defendant.

Defendants would move assets overseas and defeat the goals of an accounting. That risk, and its corresponding harm to Plaintiffs, outweighed the harm to Defendants because there was no evidence that freezing Defendants' available U.S.-based assets would do anything other than cause a cessation of infringing activity.

Here, Defendants argue they only sold a few allegedly counterfeit products, amounting to several hundred dollars in sales. In support, Defendants attach declarations attesting to the low volume of counterfeit sales from individuals asserting to be the owners of each Defendant. *See* R. 60, 61. Defendants provide no documentary evidence to support the affidavits. Defendants also do not describe any hardship incurred by keeping the funds restrained until the Court enters final judgment.

Defendants' unsupported declarations are not sufficient to overcome the vast amount of evidence Plaintiffs present that contradicts Defendants' statements. For example, Plaintiffs' evidence suggests Defendants have actually sold over $61,000 (at the manufacturer suggested price) of counterfeit products and that the amount currently restrained is less than .5% of Defendants' revenue. *See* R. 69-10, 69-11. Plaintiffs also present evidence of Defendants' PayPal accounts that show receipts of over $11 million but that only $48,660.60 is currently restrained. R. 69-12. This fact suggests that Defendants are more likely to move these funds outside of the United States if the asset restraint is lifted, making it difficult for Plaintiffs to recover from the Defendants.

In short, Defendants' evidence fails to rebut Plaintiffs' case for continuation of the injunction. Defendants' request for a 21-day extension to file their reply to "verify the sales figures" further indicates that the balance of harms warranting an injunction has not shifted in Defendants' favor. Defendants should have verified their sales figures before they filed their motion. Further, given the delay, there does not appear to be undue prejudice to Defendants to waiting until final judgment to lift the asset freeze if appropriate. A continued freeze will allow the parties to conduct discovery while preserving the status quo.

For these reasons, the freeze will remain in place, but without prejudice to Defendants offering additional evidence. Defendants' alternative request to increase the amount of bond is granted, given the amount frozen and Plaintiffs' lack of objection to the request. Plaintiffs are ordered to post $50,000 as bond.

ENTERED:

Dated: January 24, 2019

*Thomas M. Durkin*
_____
Honorable Thomas M. Durkin
United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Volkswagen AG, Volkswagen Group | ) | |
| of America, Inc., and Audi AG, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-cv-06611 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| IMAN365-USA, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Volkswagen AG, Volkswagen Group of America, Inc., and Audi AG brought this trademark-infringement lawsuit against various individuals and business entities, alleging violations of the Lanham Act, 15 U.S.C. §§ 1114, 1125, and the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510, *et seq.*[1] The Plaintiffs (who will be referred to as Audi for convenience's sake) now move for summary judgment, seeking statutory damages, a permanent injunction, and attorney's fees and costs against an online retailer known as "iman365-usa." R. 84, Mot. Summ. J.[2] For the reasons stated below, Audi wins summary judgment on liability and statutory damages (though not as much as they asked for), as well as on entry of a permanent

---

[1]The Court has federal question jurisdiction over this case under 28 U.S.C. § 1331, and supplemental jurisdiction over the state-law claim under 28 U.S.C. § 1367(a).

[2]Citations to the record are noted as "R." followed by the docket number. The acronym "PSOF" stands for Plaintiffs' Statement of Facts, which is docket entry R. 86.

injunction. The request for attorney's fees and costs also is granted, subject to the procedures in Local Rule 54.3.

## I. Background

In deciding Audi's motion for summary judgment, the Court views the evidence in the light most favorable to the Defendant, the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But because the Defendant entirely failed to respond to Audi's Local Rule 56.1 Statement of Facts, the Court "credits [Audi's] uncontroverted version of the facts to the extent that it is supported by evidence in the record." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

Volkswagen AG is the parent company of Audi AG and Volkswagen Group of America, Inc. R. 86, PSOF ¶ 1; R. 87, Cizmadia Decl. ¶ 3. Audi makes and sells cars and related products through a network of licensed dealerships. PSOF ¶ 10; Cizmadia Decl. ¶ 5. It also operates websites "through which consumers can purchase genuine Audi parts, automotive accessories, and personal goods and accessories directly from Audi." PSOF ¶ 11; Cizmadia Decl. ¶ 6. Volkswagen Group of America "polices and enforces Plaintiff Audi AG's trademarks in the United States." PSOF ¶ 2. These include the following federally registered trademarks (the "AUDI Trademarks"):

2

| Registration Number | Trademark | Registration Date | Goods and Services |
|---|---|---|---|
| 2,083,439 |  | July 29, 1997 | For: automobiles and structural parts therefor in international class 12. |
| 5,093,264 | AUDI | December 6, 2016 | For: Lighting apparatus for vehicles; lighting apparatus, namely, lighting fixtures and lighting installations in international class 11. |

*Figure 1*

*Id.* ¶ 16; Cizmadia Decl. ¶ 11.

Audi has won various awards for its cars. In 2018, for example, the Audi Q7 was named as one of *Car and Driver's* "10 Best Mid-Size Luxury Trucks and SUVs"; the Audi A4 was named "Luxury Car of the Year" by Cars.com; and the Audi Q5 and Q6 were named "2018 Best Cars for Families" in their respective classes by *U.S. News & World Report*. PSOF ¶ 15; Cizmadia Decl. ¶ 10. In Audi's 2017 *Annual Financial Report*, the company valued its Audi "brand" at around $520 million and its distribution costs for 2017 totaled about $6 billion (all dollar figures in this Opinion are in U.S. dollars). PSOF ¶ 14; Cizmadia Decl. ¶ 9, Exh. 1. The distribution-costs figure is the combination of "labour and material costs for marketing and sales promotion, advertising, public relations activities and outward freight, as well as depreciation attributable to sales organization." PSOF ¶ 14.

Defendant iman365-usa is an eBay store owned and operated since July 2017 by Jiajun Yan from the People's Republic of China. PSOF ¶ 5; R. 88-5, Martin Decl.

3

No. 1, Exh. 5; R. 87-4, Cizmadia Decl., Exh. 4. From February 22 to October 19, 2018, the Defendant sold products to Illinois customers at least 95 times, and to the larger U.S. market at least 2,117 times. PSOF ¶ 37; R. 102-1, Martin Decl. No. 2 ¶ 3, Exh. 2. Specifically, iman365-usa advertised and sold a car-door laser light which when activated, "projects an image of the AUDI Trademarks." PSOF ¶¶ 22, 24; Cizmadia Decl. ¶¶ 15, 17. The projected image looked like this:



*Figure 2*

PSOF ¶ 24. The Defendant also used the Audi word mark in the item title when listing the product: "2 LED Blue Logo Door Light Courtesy Laser Light for AUDI Q2 Q3 Q5 Q7 R8 Quattro." PSOF ¶ 21; Cizmadia Decl. ¶ 16. The product listing looked like this:

4



**Figure 1 – iman365-usa Product eBay Store Listing**

*Figure 1*

PSOF ¶ 21. The Defendant sold the laser-light product for $15.99 and accepted payments via PayPal. PSOF ¶ 23; Cizmadia Decl. ¶ 16. The Defendant also sells a variety of other car accessory products, which Audi asserts "appear to be counterfeits of other automobile company trademarks." R. 102, Pls.' Reply at 6; *see also* R. 102-2, Martin Decl. No. 2 at Exh. 1. A spreadsheet of the Defendant's PayPal account shows a "total amount received" of $137,966.23, R. 88-7, Martin Decl. No. 1, Exh. 7, but it is unclear whether that represents the total revenue for the entire history of the account, or over a more limited time period.

It is undisputed that the Defendant's product is not a genuine Audi product, that Audi has not licensed or authorized the Defendant to use the AUDI Trademarks, and that the Defendant is not an authorized retailer of genuine Audi products. PSOF ¶¶ 28-29; Cizmadia Decl. ¶¶ 19, 20. In fact, the Defendant's "only identified procedure for determining whether a supplier or manufacturer is licensed or authorized to sell

branded products is a statement that Defendant 'just found the goods through 1688,[3] and then contacted the seller to deliver [the goods].' Defendant indicated that … goods are shipped from a warehouse." PSOF ¶ 42; Martin Decl. No. 1 ¶ 13, Exh. 5.

Audi filed this suit in September 2018, alleging that the Defendant engaged in trademark infringement and counterfeiting under 15 U.S.C. § 1114 (Count 1), false designation of origin under 15 U.S.C. § 1125(a) (Count 2), and violations of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510, *et seq.* (Count 3). *See* R. 10, Am. Compl. The Court entered a Temporary Restraining Order against the Defendant on October 11, 2018, R. 27, which was extended on October 25, R. 33, and converted to a Preliminary Injunction on November 8, R. 44. The Defendant's PayPal account currently has a total restrained balance of $50,492.18. PSOF ¶ 44.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make

---

[3] "1688" appears to be a reference to 1688.com, a Chinese website that sells products wholesale. *See Alibaba Group Corporate Overview* (Aug. 2015), available at https://alibabagroup.com/assets2/pdf/Alibaba_Group_Corporate_Overview_Eng.pdf.

credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

## A. Personal Jurisdiction

As a threshold matter, this Opinion first addresses the Defendant's argument that the Court lacks personal jurisdiction. R. 101, Def.'s Resp. Br. at 10-11.[4] Absent an evidentiary hearing (the Defendant did not ask for one, nor did the Defendant

---

[4]The Defendant's argument against personal jurisdiction is not timely. On December 13, 2018, the Court set a deadline of January 11, 2019 for an amended answer or Rule 12 dismissal motion. R. 80. Although the Defendant did assert a lack of personal jurisdiction in its amended answer on January 11, R. 79, the Defendant had already waived the defense by engaging in discovery; specifically, the Defendant served the Plaintiffs with Mandatory Initial Discovery disclosures on December 27, 2018, R. 76, and with responses to Plaintiffs' first set of interrogatories and production requests on January 10, 2019, Martin Decl. No. 1, Exh. 5. *See Hedeen Int'l, LLC v. Zing Toys, Inc.*, 811 F.3d 904, 906 (7th Cir. 2016) ("[A] personal jurisdiction defense may be waived if a defendant gives a plaintiff reasonable expectation that he will defend the suit on the merits or where he causes the court to go to some effort that would be wasted if personal jurisdiction is subsequently found lacking."); *Cont'l Bank, N.A. v. Meyer*, 10 F.3d 1293, 1296-97 (7th Cir. 1993) ("The defendants did raise the defense in their answer, and therefore the waiver provided for by Rule 12(h) did not occur. However, the privileged defenses referred to in Rule 12(h)(1) may be waived by formal submission in a cause, or by submission through conduct." (cleaned up)). In any event, because Audi did not assert waiver, the Court will address this issue on the merits.

validly challenge any underlying facts), Audi "need only make out a *prima facie* case of personal jurisdiction." *Purdue Research Found. v. Sanofi-Sythelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). Personal jurisdiction requires a defendant to have made "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (cleaned up).[5] Personal jurisdiction can be either general or specific. The Court may exercise general jurisdiction if the defendant's contacts with the forum state are "so continuous and systemic as to render them essentially at home" there, *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (cleaned up), even if the lawsuit has no relationship to the defendant's contacts to that state. Here, because the Defendant is an internet store operating from China, it most certainly is not "at home" in Illinois (nor does Audi contend that it is). Instead, the question is whether the Court may exercise *specific* personal jurisdiction, which applies when a defendant has directed its activities at the forum state, and when the cause of action relates to those activities. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). The defendant's conduct must be purposefully directed at the forum state, such that the defendant would anticipate being haled into court here. *Walden v. Fiore*, 571 U.S. 277, 284-85 (2014).

---

[5]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

In this case, the Defendant's conduct was "purposefully directed" at Illinois. The Defendant's argument that "the Court lacks personal jurisdiction over them [because] sellers on eBay cannot target individuals in any state and have no control over who wins the eBay auction[,]" Def.'s Resp. Br. at 11, omits key facts that, under Seventh Circuit law,[6] dictate a finding of purposeful availment. Specifically, this argument "ignores several of [the Defendant's] own actions that led up to and followed the sales[]"—namely, that the Defendant operated a commercial, interactive online store through which U.S. customers could purchase its products, thus holding itself out as open to do business with every state, including Illinois. *See Ill. v. Hemi Grp. LLC*, 622 F.3d 754, 758 (7th Cir. 2010) (finding that online purchases were not unilateral actions by customers—which generally would not satisfy the "minimum contact" requirement—where the defendant operated a commercial website open to business with the forum state). It is true that the Seventh Circuit has cautioned courts to "be careful in resolving questions about personal jurisdiction involving online contacts to ensure that a defendant is not haled into court simply because the defendant owns or operates an interactive website … accessible in the forum state." *Matlin v. Spin Master Corp.*, 921 F.3d 701, 706 (7th Cir. 2019) (cleaned up). Here, however, Audi also provided evidence of *95* transactions between the Defendant and Illinois customers over a period of around eight months. PSOF ¶ 37; Martin Decl. No. 2 ¶ 3, Exh. 2. At least one of these transactions involved shipping a counterfeit Audi

---

[6]The Defendant cites non-Seventh Circuit cases (and indeed cites only cases *not* decided by the Seventh Circuit) to argue against personal jurisdiction, but those cases do not bind this Court. R. 101 at 10-11.

9

product to Illinois. Cizmadia Decl. ¶¶ 16-17; *see also id.* at Exh. 4. In shipping its products to Illinois customers, the Defendant was the one "reaching out to residents of Illinois, and not the residents reaching back, [which] creates the sufficient minimum contacts with Illinois that justify exercising personal jurisdiction … ." *Hemi*, 622 F.3d at 758.

Second, Audi's case-specific claims of trademark infringement stem from the Defendant's activities directed at Illinois. "Even where a defendant's conduct is purposefully directed at the forum state, the plaintiff must also show that his injury arises out of or relates to the conduct that comprises the defendant's contacts." *Felland v. Clifton*, 682 F.3d 665, 676 (7th Cir. 2012) (cleaned up). There is a split among circuit courts as to whether the defendant's contacts in the forum state must be the but-for cause or the proximate cause of the plaintiff's injuries (or both). *Id.* at 676-77. The Court does not need to decide take sides here, because the record "is sufficient even under the strictest understanding of the 'arising out of' requirement." *Id.* at 677 (cleaned up). It is undisputed that in August 2018—*before* this litigation began—the Defendant sold at least one product with the Audi trademark to an Illinois address used by Audi's investigator here in Illinois. Cizmadia Decl. ¶¶ 16-17; *id.* at Exh. 4. *Cf. Matlin*, 921 F.3d at 707 (finding no personal jurisdiction where (1) the dispute arose from an out-of-state defendant's refusal to pay royalties on *nationwide* sales, and (2) the plaintiff "attempted to salvage personal jurisdiction" *after* litigation had already begun by "luring [the defendant] into shipping a product into Illinois."). So Audi's claims that the Defendant infringed on Audi's trademarks

by selling counterfeit products cover one pre-suit example of the Defendant sending the product right into Illinois.

Finally, exercising personal jurisdiction over the Defendant does not offend "traditional notions of fair play and substantial justice." *Burger King*, 471 U.S. at 472. In evaluating this element, the Court considers "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of the underlying dispute, and the shared interest of the several States in furthering fundamental substantive social policies." *Hemi*, 622 F.3d at 759. Illinois has a strong interest in providing a forum to resolve a dispute involving the State itself—specifically, an injury in Illinois caused by an out-of-state actor. *See id.* at 760. The Defendant does not even contend that defending a lawsuit in Illinois would be an undue burden, arguing only that it had insufficient contacts with the state. *See* Def.'s Resp. Br. at 6, 10-11. But the Defendant cannot "have its cake and eat it, too" by getting "the benefit of a nationwide business model with none of the exposure." *Hemi*, 622 F.3d at 760. Because the Defendant's commercial transactions with Illinois customers established the requisite minimum contacts, the Defendant should have expected to defend that conduct in Illinois. For these reasons, there is "nothing constitutionally unfair about allowing Illinois, a state with which [the Defendant] has had minimum contacts, to exercise personal jurisdiction" over the Defendant. *Id.*

## B. Likelihood of Confusion

11

Moving on to the merits of Audi's summary judgment motion, Audi argues that it is entitled to judgment as a matter of law on the trademark-infringement and false-designation-of-origin claims, under both federal and state law. The Seventh Circuit has assumed that the same liability standard applies to both the federal and Illinois claims. *See Neuros Co. v. KTurbo, Inc.*, 698 F.3d 514, 523 (7th Cir. 2012); *Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 907 (7th Cir. 2007). *Cf. also Tarin v. Pellonari*, 625 N.E.2d 739, 745-46 (Ill. App. Ct. 1993). To succeed on these claims, Audi must establish that (1) its marks are protectable and (2) the Defendant's use of the marks is likely to cause confusion among consumers. *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673-74 (7th Cir. 2001). In this case, the parties only dispute whether the Defendant's use of the Audi trademarks caused a likelihood of confusion. *See* Def.'s Resp. Br. at 6, 8.

In assessing the likelihood of confusion, the Court considers seven relevant factors: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) whether actual confusion exists; and (7) whether the defendant intended to 'palm off' his product as that of the plaintiff." *CAE*, 267 F.3d at 677-78. "No single factor is dispositive and courts may assign varying weights to each of the factors depending on the facts presented." *Id.* at 678. Here, four of the factors are particularly relevant: the similarity of the marks, the degree of care likely to be exercised by consumers, the strength of Audi's mark, and the Defendant's intent.

12

## 1. Similarity of the Marks

On the issue of similarity, the mark displayed by the Defendant's laser-light product is indistinguishable from Audi's trademark. *Compare supra* Figure 1, *with* Figure 2. Not only does the Defendant use the same interlocking-circles graphic, but also the same font for the word "Audi," including the unique, italicized letter "d." *Id.* The Defendant also uses a similar Audi word mark in its product listing. *Compare supra* Figure 1, *with* Figure 3. Although the Defendant's mark is not capitalized like Audi's, the salient portion of the mark—the word "Audi" itself—is identical. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 898 (7th Cir. 2001) ("[I]f one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements … ." (cleaned up)). Even viewed in the Defendant's favor, the evidence shows that the marks are identical and this weighs strongly in favor of a finding of confusion. *See CAE*, 267 F.3d at 678.

## 2. The Degree of Care

On how careful the typical consumer is, the Defendant asserts that the average consumer of its product possesses such a level of mechanical skill that they would "understand that these products have no affiliation with Audi." Def.'s Resp. Br. at 10. Yet the Defendant offers no evidence suggesting that its $15.99 product requires unique mechanical skill of any kind, nor does the Defendant explain why mechanical skill would even translate into being able to discern the lack of affiliation with Audi. In fact, "[t]he more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in

13

their purchases." *CAE*, 267 F.3d at 683. Even if Audi does not offer a similar product, as the Defendant asserts, Def.'s Resp. Br. at 6, there is still a likelihood of confusion that consumers will think that Audi is indeed the maker of the product. There simply is nothing to suggest that a consumer who buys a laser-light product would carefully investigate whether the product is genuinely made by Audi.[7]

This applies too to potential consumers who see the laser-light display being used by someone who has bought the counterfeit product. That is, there is a likelihood of *post*-sale confusion, which occurs when "a *potential* customer sees a product bearing the infringing label used by others and mistakenly attributes the product to the brand owner, thereby influencing his buying decision, either positively or negatively[,]" R. 85, Pls.' Br. at 9 (emphasis added). *See CAE*, 267 F.3d at 683 ("[T]he Lanham Act's protections also extend to post-sale confusion of potential customers."). Considering that the Defendant's mark is identical to Audi's, post-sale confusion is likely too. The lack of care in buying this type of product points in favor of Audi as to likelihood of confusion.

### 3. The Strength of the Mark

Next, on this record (and with no competing Rule 56.1 Statement) a reasonable jury would have to conclude that the AUDI Trademarks are strong. "The stronger the

---

[7] Even if, hypothetically, the Defendant's customers realize the true source of the goods before they complete their purchase, there is still a likelihood of initial-interest confusion. Initial-interest confusion "occurs when a customer is lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated." *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002). It inflicts harm by misappropriating the trademark owner's goodwill. *Id.* at 812-13. Considering that the marks used by the Defendant are identical to the AUDI Trademarks, initial-interest confusion is likely.

14

mark, the more likely it is that encroachment on it will produce confusion." *AutoZone, Inc. v. Strick,* 543 F.3d 923, 933 (7th Cir. 2008) (cleaned up). First, the Plaintiffs' AUDI Trademarks are inherently distinctive. The image of the four interlocking circles is a fanciful design that uniquely identifies Audi, while the word "Audi" itself is an arbitrary mark that "neither describes nor suggests [Audi's] product or service[,]" *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 611 n.2 (7th Cir. 1965), which means even the word itself is a strong mark. *See also CAE*, 267 F.3d at 684 (explaining that arbitrary marks are generally afforded broader trademark protection); *Bliss Salon Day Spa v. Bliss World LLC*, 268 F.3d 494, 496-97 (7th Cir. 2001) (suggestive, arbitrary, and fanciful marks are collectively "distinctive in the sense that secondary meaning is likely to develop, as a result of which any duplicate use of the name is likely to breed confusion about the product's source."). In fact, Audi mark No. 2,083,439—which includes both the circle design and the word "Audi"—has been in use for a long time, since 1997. Cizmadia Decl. ¶ 11; *see CAE*, 267 F.3d at 684-85 (finding that the plaintiff's mark was strong where the plaintiff had used it for decades, spent thousands of dollars on marketing, and earned millions of dollars in sales each year).

Audi also offered evidence of the economic and marketing power wielded by the AUDI trademarks. *See AutoZone*, 543 F.3d at 933. For example, in Audi's 2017 Annual Financial Report, Audi's brand names were valued at $520 million. R. 87-1, Cizmadia Decl., Exh. 1 at 184. Audi AG expends billions of dollars in distribution costs each year, which includes marketing and sales promotion, advertising, and

15

public relations activities. *Id.* These efforts have translated into widespread popularity and consumer recognition, evidenced by the variety of automotive awards that Audi has won. *See* R. 87-2, Cizmadia Decl., Exh. 2. All in all, Audi has demonstrated that it has "built, and continues to build, a reputation for the quality of its products and services." *CAE*, 267 F.3d at 685. The strength-of-the-mark factor weighs in Audi's favor; no reasonable jury could say otherwise.

### 4. Intent

Another factor that is particularly relevant in this case is the Defendant's intent—that is, whether the Defendant intended to "palm off" their laser-light product as that of Audi's. The Defendant's argument relies on the preposition "for" in the product listing, but that reliance is misplaced. Remember that the product listing said, "2 LED Blue Logo Door Light Courtesy Laser Light *for* AUDI Q2 Q3 Q5 Q7 R8 Quattro." PSOF ¶ 21 (emphasis added). To the Defendant's way of thinking, the word "for" in the listing only meant to "describe the *compatibility* of the door light" with Audi products. *See* Def.'s Resp. Br. at 10 (emphasis added). If by "compatible" the Defendant means physically compatible and able to be affixed to an Audi Quattro, then that thinking makes little sense. Why would selling a laser light that is merely physically "compatible" with an Audi Quattro have to display the Audi trademark? Put another way, if a customer asked the Defendant, "Do you sell a laser light *for* the Audi Quattro?" and in response the Defendant offered the customer a light that displayed the Coca-Cola logo, the customer would be quite puzzled. In any event, the Defendant failed to offer any evidence of its good faith, whether by affidavit or

16

anything else. Considering the similarity of the marks, as well as the strength of the AUDI Trademarks, a jury may reasonably infer that the Defendant's appropriation of the AUDI Trademarks was intentional. *See AutoZone*, 543 F.3d at 934 ("[A]n intent to confuse may be reasonably inferred from the similarity of the marks where the senior mark has attained great notoriety."). This factor weighs heavily in the Plaintiffs' favor.

In sum, based on the relevant factors, a reasonable jury has no choice but to conclude that consumers are likely to be confused about the origin of the Defendant's product. *See AutoZone*, 543 F.3d at 929. So Audi is entitled to a judgment as a matter of law on liability as to their federal and state law claims.

## C. Statutory Damages

Having established the Defendant's liability, Audi is entitled to statutory damages. The Lanham Act provides for statutory damages in cases "involving the use of a counterfeit mark … in connection with the sale, offering for sale, or distribution of goods or services." 15 U.S.C. § 1117(c). Plaintiffs may recover "not less than $1,000 or more than $200,000 per counterfeit mark … ." or, if the defendant's conduct was willful, up to $2,000,000 per counterfeit mark. *Id.* at § 1117(c)(1)-(2). Aside from these guidelines, the amount of the statutory damages award is largely within the Court's discretion. *See id.*; *Entm't One UK Ltd. v. 2012Shiliang*, 384 F. Supp. 3d 941, 953 (N.D. Ill. 2019) (analogizing statutory damages in trademark infringement cases to those in copyright infringement cases, where "courts enjoy wide discretion … and are not required to follow any rigid formula." (cleaned up)). In setting the amount of

17

statutory damages, the Court considers factors like "the difficulty or impossibility of proving actual damages, the circumstances of the infringement, and the efficacy of the damages as a deterrent to future … infringement." *Entm't One*, 384 F. Supp. 3d at 953 (quoting *Chi-Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1229 (7th Cir. 1991)).

In this case, although Audi is entitled to statutory damages, the request of $100,000 ($50,000 per counterfeit mark) is too high. *See* Pls.' Br. at 10. The low price of the Defendant's product ($15.99) and the Defendant's relatively short time in business (a little over two years) are mitigating factors. *See Luxottica USA LLC v. The P'ships and Unincorporated Ass'ns Identified on Schedule "A"*, 2015 WL 3818622, at *2 (N.D. Ill. June 18, 2015) ("[S]tatutory damages must bear some relation to actual damages[.]" (cleaned up)). What's more, although the Defendant's "discovery disclosures were half-hearted, [the Defendant's] willful infringement is somewhat mitigated by the fact that they chose to respond to this action rather than defaulting." *Entm't One*, 384 F. Supp. 3d at 954.

On the other hand, several aggravating factors are at play. For one, the Defendant's business is not a small-scale, personal-hobby operation. Audi presented evidence that the Defendant's PayPal account has received $137,966.23 in total payments. Martin Decl. No. 1 at Exh. 7. It is true that the time period for these receipts is not clear. Nor is it known how much of that total can be attributed to the counterfeit product. But even if it took the entire two years of the Defendant's existence to bring in that revenue, still that is a substantial sum. It is also relevant

18

that the Defendant's conduct was willful, *see supra* Section III(B)(4), because "the statutory damages award may be designed to penalize the infringer and to deter future violations[,]" *Entm't One*, 384 F. Supp. 3d at 953 (citing *Chi-Boy Music*, 930 F.2d at 1229-30). Here, not only is there a need to deter trademark infringement generally, but there is also a heightened need to deter future violations by this Defendant, who "continues to offer for sale 'logo lights' that appear to be counterfeits of other automobile company trademarks[,]" Pls.' Reply at 6. Weighing in favor of a high statutory damages award is also Audi's "efforts to protect, promote, and enhance" the Audi brand's value. *See Entm't One*, 384 F. Supp. 3d at 953. Audi has "a worldwide anti-counterfeiting program," and has actively enforced its trademark rights by filing multiple trademark infringement lawsuits. PSOF ¶ 20. Audi also expends millions of dollars every year to market Audi products. PSOF ¶ 14; Cizmadia Decl. ¶ 9, Exh. 1.

On balance, the Court finds that a statutory damages award in the amount of $75,000 ($37,500 per counterfeit mark) is sufficient to fulfill the goal of statutory damages under 15 U.S.C. § 1117(c).

### D. Permanent Injunction

Audi also seeks a permanent injunction "enjoining Defendant from advertising, offering for sale, and/or selling Counterfeit Audi Products or otherwise violating Plaintiffs' rights in the AUDI Trademarks." Pls.' Br. at 17. "A plaintiff seeking a permanent injunction must show that: (1) it has suffered an irreparable injury; (2) legal remedies, such as monetary damages, cannot adequately compensate

19

for that injury; (3) the balance of hardships between the parties warrants an equitable remedy; and (4) a permanent injunction would not harm the public interest." *Entm't One*, 384 F. Supp. 3d at 955 (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). "The first two requirements, irreparable harm and inadequate remedy at law, are presumed in trademark infringement cases." *Id.* (citing *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000); *MetroPCS v. Devor*, 215 F. Supp. 3d 626, 639 (N.D. Ill. 2016)). *See also Re/Max North Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001); *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992). The Defendant has made no meaningful attempt to rebut this presumption. *See* Def.'s Resp. Br. at 12-13.

Turning to the first element at issue, the balance of hardships tips in favor of Audi. The Defendant asserts, without providing any supporting evidence, that it has "ceased all sales of the disputed products upon receipt of notice of this lawsuit." Def.'s Resp. Br. at 13. This suggests that the Defendant no longer relies on sales of the counterfeit product and is not at risk of losing any money or business as a result of a permanent injunction. *See Black & Decker Inc. v. Robert Bosch Tool Corp.*, 2006 WL 3446144, at *5 (N.D. Ill. Nov. 29, 2006). Not to mention, enjoining the Defendant from violating the law cannot, by its very nature, cause the Defendant any harm. *See Miyano Machinery USA, Inc. v. MiyanoHitec Machinery, Inc.*, 576 F. Supp. 2d 868, 888 (N.D. Ill. 2008) ("In assessing any irreparable harm [the defendant] may suffer, this Court excludes any burden it voluntarily assumed by proceeding in the face of a known risk." (cleaned up)); *see also Coach, Inc. v. 3D Designers Inspirations*, 70 F.

20

Supp. 3d 942, 950 (C.D. Ill. 2014) (finding that the balance of hardships weighed in favor of granting a permanent injunction because the infringing party "never had a legal right to profit from such counterfeiting" in the first place).

Finally, the public interest would actually be served by a permanent injunction because "enforcement of the trademark laws prevents consumer confusion." *Eli Lilly*, 233 F.3d at 469. This is particularly important where the Defendant fails to offer any evidence of reform, and instead continues to sell "'logo lights' that appear to be counterfeits of other automobile company trademarks[,]" Pls.' Reply at 6. *See also* R. 102-4, Martin Decl. No 2. at Exh. 3; *Weigand v. Vill. of Tinley Park*, 129 F. Supp. 2d 1170, 1172 (N.D. Ill. 2001) ("[I]t is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." (cleaned up)). Accordingly, the Court permanently enjoins the Defendant from advertising, offering for sale, or selling products using the AUDI Trademarks.

### E. Attorney's Fees

The Lanham Act provides for reasonable attorney's fees and costs to prevailing parties who prevail in counterfeit-trademark infringement cases, unless the Court finds "extenuating circumstances." 15 U.S.C. § 1117(b). Here, the Defendant fails to proffer any persuasive mitigating circumstances that would weigh against fee-shifting. So, having raised the inference that the Defendant willfully infringed on their AUDI Trademarks, Audi is entitled to reasonable attorney's fees and costs

under the Lanham Act. The parties shall follow Local Rule 54.3 in litigating the amount of fees and costs.

### IV. Conclusion

For the reasons discussed, Audi's motion for summary judgment is granted against the Defendant on all claims—federal trademark infringement and counterfeiting (Count 1), false designation of origin (Count 2), and violation of the Illinois Uniform Deceptive Trade Practices Act (Count 3). Audi is also awarded statutory damages in the total amount of $75,000 pursuant to 15 U.S.C. § 1117(c), and a permanent injunction against the Defendant as described earlier. The Plaintiffs are also entitled to reasonable attorney's fees and costs, and may file a petition for such fees after complying with the requirements of Local Rule 54.3. The status hearing of March 27, 2020 is vacated. Final judgment shall be entered.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: February 28, 2020

22

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KTM AG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 1:21-cv-1280 |
| | ) | |
| The Individuals, Corporations, Limited | ) | |
| Liability Companies, Partnerships, and | ) | |
| Unincorporated Associations Identified | ) | Hon. Gary S. Feinerman |
| On Schedule A Hereto, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS LUBAISHENG, MENGTAO, MODI FLY, MONSTERKING, NOTONMEK PARTS, ORANGEABC, OTELAS, PODOY, SPMSUPPLIER, SMSEACE, STARTGOODLUCK, TONG TONG TRADE CO. LTD., USPEEDA - US DIRECT SHIPPING, AND VICUE'S MOTION TO DISMISS

COME NOW Defendants Lubaisheng, MENGTAO, Modi Fly, MonsterKing, Notonmek Parts, OrangeABC, OTELAS, PODOY, SPMSUPPLIER, smseace, startgoodluck, Tong Tong Trade Co. Ltd., USPEEDA - US DIRECT SHIPPING, and Vicue (hereinafter "Moving Defendants"), by and through counsel, and file this Motion to Dismiss pursuant to Federal Rule of Procedure 12(b)(6), showing the Court as follows:

I.     INTRODUCTION

Moving Defendants are independently operated Amazon.com storefronts, each of which is in the business of selling, among other products, aftermarket motorcycle parts. Moving Defendants maintain offices in the People's Republic of China. Plaintiff is suing Moving Defendants for trademark infringement under the Lanham Act for selling competing aftermarket motorcycle parts on Amazon, the listings for which include descriptive fair use of the word

"KTM." Each of the listings upon which KTM has based its claims against Moving Defendants includes language indicating that the Moving Defendants' parts are compatible with KTM products. Many of the listings are for products that are compatible with KTM products as well as many other manufacturers, including Kawasaki, Ducati, BMW, Harley Davidson, and Honda.

Many of the Moving Defendants did not have any actual sales of the products upon which Plaintiff has based its claims. Plaintiff's claims against Moving Defendants should be dismissed because Moving Defendants' listings for the products complained about by Plaintiff in this matter constitute descriptive fair use.

## II.    ARGUMENT

### A.    Plaintiff's Complaint Against Moving Defendants Should Be Dismissed Pursuant to Federal Rule of Civil Procedure 12(b)(6) Because Moving Defendants' Use Of The Term KTM In Its Online Listings Constitutes Fair Use.

Moving Defendants' "use" of the term "KTM" is fair use, and thus Plaintiff has failed to state a claim under the Lanham Act or Illinois law. Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) is appropriate.

#### 1.    Legal Standard

A Rule 12(b)(6) motion challenges the sufficiency of a complaint. Bonnstetter v. City of Chicago, 811 F.3d 969, 973 (7th Cir. 2016). A complaint must contain enough information via "a short and plain statement of the claim" to give the defendant fair notice of the claim and its basis. Fed. R. Civ. P. 8(a)(2); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). To prevail on either a trademark claim or unfair competition claim, a plaintiff must demonstrate that the defendants' use of a protectable mark is likely to cause confusion among consumers. Phoenix Entm't Partners v.

<u>Rumsey</u>, 829 F.3d 817, 822 (7th Cir. 2016). A plaintiff must thus plead allegations that make it plausible that such likelihood of confusion exists. *See*, <u>Fortres Grand Corp. v. Warner Bros. Entm't Inc.</u>, 763 F.3d 696, 700 (7th Cir. 2014) ("Allegations of consumer confusion in a trademark suit, just like any other allegations in any other suit, cannot save a claim if they are implausible).

Instead, Plaintiff pleads facts which demonstrate the implausibility of a likelihood of confusion, namely, Defendant's fair use of Plaintiff's mark. 15 U.S.C. § 1115(b)(4); *See* <u>Packman v. Chi Tribune Co.</u>, 267 F.3d 628, 639 (7th Cir. 2001) (observing that when no likelihood of consumer confusion exists, the defendants use is often found to be fair use).  Statutory fair use will serve as a complete defense to a claim for trademark infringement if the Defendant can show: (i) it did not use the mark as a trademark; (ii) the use is descriptive of its goods; and (iii) it used the mark fairly and in good faith. <u>Packman</u>, 267 F.3d at 639. While fair use is an affirmative defense, the Court may consider an affirmative defense in analyzing a 12(b)(6) motion if the facts necessary to make the determination are evident on the face of the complaint.  <u>Hoopla Sports & Entm't, Inc. v. Nike, Inc.</u>, 947 F. Supp. 347, 356 (N.D. Ill. 1996), *quoting*, <u>Quiller v. Barclays Am./Credit, Inc.</u>, 727 F.2d 1067, 1069 (11th Cir. 1984); <u>Tamayo v. Blagojevich</u>, 526 F.3d 1074, 1086 (7th Cir. 2008) ("If the plaintiff voluntarily provides unnecessary facts in her complaint, the defendant may use those facts to demonstrate that she is not entitled to relief.").  Documents not attached to the complaint may be considered if they are referred to in the complaint, are concededly authentic, and are central to the plaintiff's claim. <u>Hecker v. Deere & Co.</u>, 496 F. Supp. 2d 967, 972 (W.D. Wis. 2007), *aff'd*, 556 F.3d 575 (7th Cir. 2009), *citing*, <u>Tierney v. Vahle</u>, 304 F.3d 734, 738 (7th Cir. 2002).

### 2. Moving Defendants Did Not Use "KTM" As A Source Identifier.

Moving Defendants' product listings on Amazon clearly indicate that the products are sold by Moving Defendants, sometimes under their brands for which they have registered marks, and not from KTM. (Ex. A) When a defendant uses other trademarks as source indicators, the action is likely a non-trademark use and is therefore fair use. Packman, 267 F.3d at 639-40. Moving Defendants clearly identify themselves as the source of the product in the listing text and in the title of each listing complained about by Plaintiff. Moving Defendant are not using KTM's mark.

### 3. Moving Defendants' Use Of The Term "KTM" Was Descriptive.

A descriptive term "is one that merely describes the ingredients, qualities, or characteristics of an article of trade or service. Timelines, Inc. v. Facebook, Inc., 938 F. Supp. 2d 781, 793 (N.D. Ill. 2013), quoting, Mil-Mar Shoe Co., Inc. v. Shonac Corp., 75 F.3d 1153, 1157 (7th Cir. 1996). Moving Defendants' listings say their parts are "compatible with KTM" or "for KTM." By indicating that their products are compatible with KTM products, Moving Defendants are clearly indicating that the product is not the KTM product, but rather a product offered by each Moving Defendant, often including Moving Defendant's registered brand, that is compatible with a KTM product or product.

Plaintiff provided the Court with listings from each of the Moving Defendants' Amazon storefronts in support of its Motion for Temporary Restraining Order. (ECF No. 10-11). Each of the listings for Moving Defendants contains only sufficient mention of KTM to identify that Moving Defendants' products are compatible with them. The listings contain the following descriptions:

Defendant Lubaisheng: A listing for Lubaisheng's brand, Road Passion, for an oil filter that is indicated to be a fit "for KTM" products. (Ex. A - declaration of Hualei Wang)

Defendant MENGTAO: Three listings, one for a front brake pad, and two for sets of dust seals. Each of these items is clearly marked with MENGTAO's brand, XuLong. (Ex. A - declaration of Hualei Wang)

Defendant Modi Fly: A single listing for a set of chrome motorcycle rear view side mirrors for Modi Fly's brand, Surpassme. The only reference to KTM in the listing is a reference to KTM, among other manufacturers, as being compatible with the Surpassme mirrors. (Ex. B - declaration of Shaojun Wu)

Defendant MonsterKing: Three listings, one for a motorcycle exhaust muffler pipe, and two listings for flywheel magneto stator puller tools. Each of these listings were clearly marked as fitting KTM. Their brand was clearly marked and was not represented to be KTM. (Ex. C - declaration of Zhang Zoulin)

Defendant Notonmek Parts: A single listing for a Notonmek Parts brand 12V voltage regulator. The product description includes the descriptive language "fits for KTM." (Ex. D)

Defendant OrangeABC: Three listings for carburetors, each listed as being "for KTM" or compatible with KTM products. (Ex. C - declaration of Zhang Zoulin)

Defendant OTELAS: A single hydraulic master cylinder clutch lever. The listing refers to the part as being "for KTM." The listing also specifically indicates that this is an aftermarket GYUKSIA brand part. (Ex. E)

Defendant PODOY: A single listing for a Podoy brand oil filter. The second page of the listing contains a list of manufacturers whose products are compatible with this oil filter. KTM is on that list. (Ex. F)

Defendant smseace: A single listing for a smseace brand flasher relay. The listing clearly indicates that it is a smseace brand component and references compatibility with KTM, among other manufacturers. (Ex. G - declaration of Haiou Song)

Defendant SPMSUPPLIER: A single listing for a 2-pin LED flasher relay which references that the part is compatible with KTM. (Ex. H - declaration of James Wei)

Defendant startgoodluck: A single listing for a generic carburetor. The listing clearly indicates that it is a generic part, and the only reference to KTM in the listing is a reference to KTM, among other manufacturers, in the product description regarding compatibility. (Ex. I - declaration of Xiaoci Li)

Defendant Tong Tong Trade Co., Ltd.: A listing for a front sprocket clearly marked with Tong Tong's brand, AHL. (Ex. A - declaration of Hualei Wang)

Defendant USPEEDA - US DIRECT SHIPPING: A single listing for a USPEEDA brand 2X 2-pin electronic LED flasher relay. The listing text mentions that the part is compatible with Yamaha and Vmax products. On the second page of the listing there is a product description chart that includes a compatibility list. KTM is on that list. (Ex. H - declaration of James Wei)

Defendant Vicue: A single listing for a Vicue brand left handlebar control headlight turn signal and horn switch described as "Universal for Yamaha Suzuki BMW Honda Harley Ducati Bobber Chopper Kawasaki." KTM is mentioned in the fit description below the main

heading of the listing among a list of other manufacturers whose products would fit or be compatible with the Vicue part featured in the listing. (Ex. C - declaration of Zhang Zoulin)

The listings complained about by Plaintiff clearly indicate that Moving Defendants are the source of the goods being sold. Use of the phrase "compatible with" or "for" KTM and other brands including Kawasaki, Yamaha, and Honda describes a characteristic of Moving Defendants' products: namely, that they are compatible with KTM products and not, for example, compatible with other products like Ducati. This is plainly a descriptive use of Plaintiff's trademark. Moving Defendants clearly indicate that their parts are "compatible with" or "for" KTM, which by definition is evidence that they are not representing that they *are* KTM or authorized by KTM. None of the products offered by Moving Defendants bear KTM's logo or name.

### 4.  Moving Defendants' "Use" Of The Term KTM, Was In Good Faith.

A party asserting the fair use defense to trademark infringement "must show that it used the plaintiff's mark fairly and in good faith." Sorensen v. WD-40 Co., 792 F.3d 712, 725 (7th Cir. 2015). Courts may consider the dissimilarity in packaging, labeling, and display of the competing products when assessing good faith by the defendant. SportFuel, Inc. v. PepsiCo, Inc., 932 F.3d 589, 600 (7th Cir. 2019). "Mere knowledge" of the plaintiff's mark is insufficient to demonstrate bad faith. Id.

It is clear from reviewing Plaintiff's evidence and Moving Defendants' online storefronts that the products are labeled and display patterns that are dissimilar to one another. *Compare*, the example of KTM's website provided by Plaintiff in its Complaint (ECF No. 1, ¶7) with the listings Plaintiff provided to the Court in support of its Motion for Preliminary Injunction

(Exhibit A). Moving Defendants sell their products from Amazon online marketplace accounts that bear no resemblance to KTM's website. These Amazon listings do not imply any sort of a relationship to KTM's trademarks or KTM's business, and expressly identify themselves by name and brand on the online marketplace. (Exhibit A); *See*, <u>Packman</u>, 267 F.3d at 642; <u>Ciociola v. Harley-Davidson Inc.</u>, 552 F. Supp. 2d 845, 864 (E.D. Wis. 2008), as amended (May 28, 2008) (defendant's use of plaintiff's mark was in good faith where defendant used its own distinctive mark to indicate the product's source, suggesting lack of intent to use plaintiff's mark as a trademark). This removes any likelihood of confusion to consumers that there is some association or sponsorship between Plaintiff and Moving Defendants' products. Accordingly, Moving Defendants "used" the term "KTM" in their product titles in a descriptive manner and in good faith and Plaintiff does not allege otherwise.

     5. **Moving Defendants' "Use" Of The Term KTM Was, Alternatively, Nominative.**

     Moving Defendants' "use" of Plaintiff's trademark was plainly nominative. Such a use of Plaintiff's trademark constitutes nominative fair use because it is solely meant to inform consumers of its compatibility with Plaintiff's product and does not suggest sponsorship or endorsement by Plaintiff. *See*, <u>Illinois High Sch. Ass'n v. GTE Vantage Inc.</u>, 99 F.3d 244, 246 (7th Cir. 1996), as amended (Dec. 3, 1996); <u>Data Mgmt. Ass'n Int'l v. Enter. Warehousing Sols., Inc.</u>, No. 20 C 04711, 2020 WL 7698368, at *2 (N.D. Ill. Dec. 28, 2020) (collecting cases). Borrowing Ninth Circuit analysis, a nominative fair use defense requires that: (i) the product or service in question must be one not readily identifiable without use of the trademark; (ii) only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and (iii) the user must do nothing that would, in conjunction with the mark, suggest

sponsorship or endorsement by the trademark holder. <u>New Kids on the Block v. News Am. Pub.,</u> <u>Inc.</u>, 971 F.2d 302, 308 (9th Cir.1992); *See*, <u>Ty, Inc. v. Publications Int'l, Ltd.</u>, No. 99 C 5565, 2005 WL 464688, at *6 (N.D. Ill. Feb. 25, 2005) ("The New Kids test provides sound criteria for assessing when nominative use is fair or unfair, despite a likelihood of confusion among consumers.").

Moving Defendants provide aftermarket products that are compatible with products which are sold by KTM, and many other manufacturers. Moving Defendants and KTM are competitors in the aftermarket motorcycle business. Moving Defendants' use of the word "KTM" in the product listing serves merely to identify to consumers that their products will function with Plaintiff's products. Without Moving Defendants' minuscule utilization of the term KTM, a purchaser would not know whether Moving Defendants' product could be compatible with Plaintiff's product. The product listings at issue expressly and plainly identify Moving Defendants as being the source identifiers and do not suggest in any way that Moving Defendant are associated with or sponsored or endorsed by Plaintiff. (Exhibit A).

Plaintiff's Complaint, and the documents Plaintiff provided to the Court in support of its Complaint and its sealed motions for a temporary restraining order and a preliminary injunction, admit all of the elements of nominative fair use. (ECF No. 1, ¶ 15-20]; (Exhibit A); *Cf.*, <u>Slep-Tone Entm't Corp. v. Coyne</u>, 41 F. Supp. 3d 707, 718 (N.D. Ill. 2014) ("because the complaint does not admit all the ingredients of the nominative fair use defense, the defense does not provide a basis for a Rule 12(b)(6) dismissal."). Plaintiff's complaint should be dismissed, and the preliminary injunction dissolved.

III.     CONCLUSION

Moving Defendants are online storefronts run by independent sellers located in the People's Republic of China. It is clear from the facts in Plaintiff's Complaint and the declarations provided by the operators of Moving Defendants' storefronts that Moving Defendants do not use any marks owned by Plaintiff in any manner that would likely cause consumer confusion, dilution, or degradation of Plaintiff's reputation. Any use of marks was in good faith and done to identify the compatibility of Moving Defendants' aftermarket motorcycle parts. This "use" constitutes fair use, and thus Plaintiff's claims of infringement must fail.

WHEREFORE, Moving Defendants respectfully request that the Court enter an Order dismissing them from this matter, and awarding them any other relief the Court deems just and proper.

Respectfully submitted,

/s/ Erin K. Russell
Erin K. Russell, Esq.
Counsel for Moving Defendants
THE RUSSELL FIRM, LLC
833 W. Chicago Avenue, Suite 508
Chicago, IL 60642
312-994-2424
erin@russellfirmip.com

CERTIFICATE OF SERVICE

This is to certify that on May 14, 2021, a copy of the foregoing was filed via the Court's ECF filing system, thereby serving it upon all counsel of record.

/s/ Erin K. Russell